**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 15-cv-0751-WJM-MEH

BRIAN HINMAN,

      Plaintiff,

v.

JONATHAN JOYCE, and
CITY AND COUNTY OF DENVER, COLORADO,

      Defendants.

---

**ORDER GRANTING WITHOUT PREJUDICE CITY AND COUNTY OF DENVER'S
MOTION TO DISMISS**

---

      Plaintiff Brian Hinman ("Hinman") sues Denver Police Detective Jonathan Joyce ("Joyce") and the City and County of Denver ("Denver") for alleged violation of his constitutional rights when Hinman was held in pretrial detention for ten months on suspicion of a crime he did not commit.  (ECF No. 1.)  Currently before the Court is Denver's Motion to Dismiss.  (ECF No. 15.)  For the reasons explained below, the motion is granted without prejudice to amendment.

## I.  LEGAL STANDARD

      Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a claim in a complaint for "failure to state a claim upon which relief can be granted."  The 12(b)(6) standard requires the Court to "assume the truth of the plaintiff's well-pleaded factual allegations and view them in the light most favorable to the plaintiff."  *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).  In ruling on such

a motion, the dispositive inquiry is "whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Granting a motion to dismiss "is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice." *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (internal quotation marks omitted).  "Thus, 'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.'" *Id.* (quoting *Twombly*, 550 U.S. at 556).

## II.  FACTS

The Court assumes the following facts to be true for purposes of this motion.

In October 2013, Hinman "was incarcerated in the Denver County Jail, serving a misdemeanor sentence for violation of a restraining order relating to his ex-girlfriend, Kendra Paquin." (ECF No. 1 ¶ 13.)  Hinman "shared a cell with three other inmates, with [whom] he blunderously shared information regarding the source of his legal troubles and the matters foremost on his mind, including the emotionally charged nature of his relationship with Ms. Paquin."  (*Id.* ¶ 14.)

One of Hinman's cellmates was a methamphetamine addict named Brien Roberts ("Roberts").  (*Id.* ¶ 15.)  Roberts "was known to be an unreliable [*sic*] and methamphetamine addict by the Denver Police Department."  (*Id.* ¶ 16.)  Roberts was also "a storyteller, and knew of Denver's willingness to provide reductions in sentences to those who appeared to cooperate and/or [*sic*] by providing information about others'

crimes." (*Id.*)

On October 5, 2013, Roberts managed to speak with Detective Joyce, to whom he told "a fantastic tale." (*Id.* ¶ 19.)  Roberts said that he and Hinman had been otherwise alone in their cell for about an hour on the previous day, upon which "Hinman had solicited [Roberts] to burglarize and murder [Paquin]." (*Id.*)  This alleged solicitation "included detailed information about the purported setting of the Paquin residence surrounded by a security fence, [and] a purported hole in the security fence adjacent to a liquor store." (*Id.*)  Roberts also added "true information that he had quietly collected [from Hinman]," such as the sorts of property that Hinman had left at Paquin's home. (*Id.* ¶ 20.)  In conveying this information to Joyce, Roberts made clear that he wanted to be rewarded through early release from his sentence. (*Id.* ¶ 21.)

Joyce "had serious doubts about the reliability of [Roberts], and the information [Roberts] provided." (*Id.* ¶ 22.)  A few days later, Joyce personally visited the Paquin residence and learned that there was no security fence and no adjacent liquor store. (*Id.* ¶ 23.)  Joyce then requested the surveillance video for Hinman's cell during the day that the solicitation allegedly took place. (*Id.* ¶ 25.)  The video revealed that Hinman and Roberts "were only together, alone in the cell, during three independent periods of time lasting for 34 seconds, 115 seconds, and 55 seconds, respectively," during which time Hinman and Roberts were "incommunicative." (*Id.*)  Joyce nonetheless moved Hinman to solitary confinement and filed charges against Hinman for solicitation of murder and burglary. (*Id.* ¶¶ 27–28.)  Joyce's probable cause statement and later testimony at a probable cause hearing both omitted any details about Roberts's

unreliability.  (*Id.* ¶¶ 28–30.)  Moreover, Joyce "falsely indicated that the [surveillance] video showed there was sufficient time and opportunity for the exchange Roberts described, and that [the] video showed the two exchanging information/documents." (*Id.* ¶ 30.)

The Denver District Attorney's office dismissed the charges against Hinman in July 2013, concluding "that there was a lack of evidence that the alleged crimes had been committed."  (*Id.* ¶ 32.)

## III.  ANALYSIS

Invoking 42 U.S.C. § 1983, Hinman has sued Joyce for unconstitutional seizure and prosecution.  (*Id.* ¶¶ 34–49.)  Further invoking § 1983, Hinman has also sued Denver under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), alleging municipal liability on essentially three theories: (1) Denver's alleged "policy and/or practice of conferring benefits upon suspected or convicted criminals who provided information about other crimes and/or the perpetrators of such crimes—whether such information was reliable or not"; (2) Denver's alleged failure to train its detectives about the veracity and reliability problems of jailhouse informants; and (3) Denver's alleged failure to train Joyce "in how to determine appropriate probable cause in the totality of the circumstances, and/or when/how probable cause could be vitiated during police investigation."  (ECF No. 1 ¶¶ 51–54.)

Denver argues that the claims against it are no more than the "labels and conclusions" or "formulaic recitation[s] of the elements of the cause of action" that the Supreme Court condemned in *Twombly*, *supra*, and *Ashcroft v. Iqbal*, 556 U.S. 662

(2009).  (ECF No. 15 at 3–11.)  The Court agrees.  The essential logic behind Hinman's Complaint is that Joyce committed certain constitutional violations, and therefore Denver must have had a policy or practice (or lack of a practice, such as proper training) that caused Joyce to act as he did.  But the Complaint contains no allegations to support the "therefore."  Hinman simply asserts the ultimate conclusions that he wishes to prove.

Hinman responds by pointing to paragraph 16 of the Complaint, where he alleges that Roberts "knew of Denver's willingness to provide reductions in sentences to those who appeared to cooperate and/or [*sic*] by providing information about others' crimes."  (ECF No. 1 ¶ 16.)  But this only shows an alleged policy of providing leniency to inmates who cooperate or assist in solving other crimes—a policy or practice likely shared by every jurisdiction in the country.  It is not the same as the policy Hinman later alleges, *i.e.*, a policy of providing such leniency "whether such information was reliable or not."  (*Id.* ¶ 51.)  Hinman alleges nothing to support that all-important qualifying phrase.

Hinman additionally points to his allegation that "Denver's policy and practice has motivated other criminals to concoct false tales and accusations before."  (*Id.* ¶ 53.)  But again, the question is whether other criminals concocted false tales and accusations because they knew that Denver would accept those tales and accusations "whether . . . reliable or not."  If such a policy or practice actually existed, and if Hinman is indeed aware of criminals other than Roberts who took advantage of it, then Hinman should have no trouble pleading such examples.  For whatever reason, he has refused to do so, leaving this allegation without support.

5

Finally, on two occasions Hinman refers to his Complaint as "factually-rich," in supposed contrast to the bald conclusions or assertions condemned in *Twombly* and *Iqbal*. (ECF No. 19 at 6, 13.)  With respect to Joyce's conduct, the Complaint is indeed factually rich, demonstrating a pre-filing "inquiry reasonable under the circumstances." *See* Fed. R. Civ. P. 11(b).  The allegations against Denver, however, are merely tacked on to the end of the Complaint, lacking any detail whatsoever.  Furthermore, Hinman has cited no authority suggesting that *Monell* liability is a plausible inference purely from the fact that an individual municipal official committed a constitutional violation.

The Court does not hold that Hinman could never state a claim for *Monell* liability under these circumstances.  Thus, although the Court must dismiss Hinman's current claim against Denver, the dismissal is without prejudice to amendment.[1]

## IV.  CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.    Denver's Motion to Dismiss (ECF No. 15) is GRANTED;

2.    Hinman's claim against Denver is DISMISSED WITHOUT PREJUDICE; and

3.    To allow Hinman sufficient time within which to conduct the discovery he needs to determine whether he can properly amend his claim against Denver to cure

---

[1] Discovery with respect to Joyce could legitimately include discovery about the training he received.  If that discovery reveals that Joyce was indeed untrained about the skepticism with which a detective must treat a jailhouse informant's claims, or untrained about evaluating probable cause, Hinman may have a basis for re-alleging his failure-to-train claim.  As for the alleged policy or practice of taking jailhouse informants' assertions at face value, Hinman alleges that such a practice is known among inmates.  (ECF No. 1 ¶ 16.)  The Court presumes that such an allegation would never have been made absent a supporting basis.  *See* Fed. R. Civ. P. 11(b)(3).  Accordingly, whatever support Hinman may have could potentially provide grounds to re-allege the policy/practice claim.

the factual allegation deficiencies noted in this Order, Hinman's deadline to amend his complaint is EXTENDED to December 15, 2015.

Dated this 23rd day of October, 2015.

BY THE COURT:

William J. Martinez
United States District Judge